[Civ. No. 15240. Second Dist., Div. Two. May 2, 1946.]

Estate of WALTER DAVIS, Deceased. JAMES B. BOYLE, Petitioner and Respondent, v. PASADENA COLLEGE, Appellant; SAN FRANCISCO THEOLOGICAL SEMINARY et al., Contestants and Respondents; COMMUNITY CHEST OF PASADENA et al., Legatees and Respondents.

Roland Maxwell and Paul H. Marston for Appellant.

White & Harber and Lawrence A. Schei as Amici Curiae on behalf of Appellant.

Boyle, Holmes, Fry & Garrett for Petitioner and Respondent.

Hahn & Hahn, Irving M. Walker and D. S. Hammack for Legatees and Respondents.

Meserve, Mumper & Hughes and Walter H. Odemar for Contestants and Respondents.

McCOMB, J.—Mr. Walter Davis died October 17, 1943, leaving surviving him a sister, nephews and nieces. On July 10, 1943, he had executed a will which contained, among others, these two provisions:

"Tenth: After carrying out all the foregoing provisions of this my will, I give, devise and bequeath all the rest, residue and remainder of my estate, real, personal and mixed and wherever situated, in equal shares to the following named beneficiaries, to wit:

*Pasadena Home for the Aged,* of Altadena, California;
*Boys' and Girls' Aid Society,* of Altadena, California;
*Pasadena Preventorium,* of Altadena, California;
*Salvation Army, Inc.,* Pasadena Branch, Pasadena, California;
*Los Angeles Orthopaedic Foundation,* Los Angeles, California;
*San Francisco Theological Seminary,* San Anselmo, California;
*Trustees of Pasadena College (Nazarene),* Pasadena, California;
*Travelers Aid Society,* Los Angeles, California; and
*Community Chest of Pasadena,* Pasadena, California.

"In the event any of the charitable corporations or institutions hereinabove named in this Paragraph *Tenth* shall not

be in existence at the date of my death, or for any reason under the laws of the State of California cannot take and receive the devise and bequest hereinabove made to such charitable corporation or institution, then in such event I give, devise and bequeath the portion of said residuary estate devised and bequeathed to such charitable corporation, in equal shares, to the other charitable corporations or institutions hereinabove named which are then in existence and can take and receive the property herein devised and bequeathed to them.

''Eleventh: In the event that for any of the reasons set forth in Sections 41, 42 or 43 of the Probate Code of the State of California my executors or executor are unable to distribute any portion of my estate upon my death as hereinabove provided in Paragraphs *Eighth* and *Tenth* of this my will, I direct that in such event said portion of my estate shall be distributed, and I give, devise and bequeath the same, to James B. Boyle of San Marino, California, and to Clarence A. Matthews, of Pasadena, California, or to the survivor of them. Without intending to create any trust or other charge, condition or limitation enforceable in either law or equity, I request the persons or person receiving said property to use and dispose of the same so as to carry out my wishes.''

The total value of the residuary devises and bequests, together with the specific bequests to charitable institutions, exceeds one third of the net distributable estate of the testator.

Appellant Pasadena College and the San Francisco Theological Seminary, two of the nine legatees named in paragraph Tenth of the will are exempt from taxation under section 1(a) of article XIII of the Constitution of the State of California and, therefore, are not subject to the limitations on bequests to charitable and benevolent organizations set forth in section 41 of the Probate Code. The other seven legatees mentioned in said paragraph are not so exempt.[1]

---

[1]Section 41 of the Probate Code as variously amended including the amendment of 1943 (Stats. 1943, ch. 305, p. 1296), now reads:

''No estate, real or personal, may be bequeathed or devised to any charitable or benevolent society or corporation, or to any person or persons in trust for charitable uses, by a testator who leaves a spouse, brother, sister, nephew, niece, descendant or ancestor surviving him, who, under the will, or the laws of succession, would otherwise have taken the property so bequeathed or devised, unless the will was

An executor filed a petition for the construction of the will and for instructions to determine who was entitled to the distribution of the residuary estate. The probate judge held that the bequests of the residuary estate to the nine institutions named in paragraph Tenth of the will were valid and that upon distribution, the residuary estate should be distributed to such nine institutions. From this order the present appeal is taken.

Appellant urges *that because the period of six months did not elapse between the making of the will and the death of the testator those provisions of the will giving to charity more than one third in value of the distributable estate are invalid and, therefore, under the provisions of paragraph Tenth of the will, the portion of said residuary estate devised and bequeathed to such charities which exceeds one third in value of the distributable estate is devised and bequeathed to the other charitable corporations or institutions named in said paragraph Tenth which can take and receive the property, to wit: Pasadena College and the San Francisco Theological Seminary, which are exempt from limitations upon gifts to charity by will and are entitled to have distributed to them an appropriate portion of the estate which, but for the restrictions of law upon testamentary gifts to charity would pass to the named charities.*

---

duly executed at least 30 days before the death of the testator. If so executed at least 30 days before death, such devises and legacies shall be valid, but they may not collectively exceed one-third of the testator's estate as against his spouse, brother, sister, nephew, niece, descendant or ancestor, who would otherwise, as aforesaid, have taken the excess over one-third, and if they do, a pro rata deduction from such devises and legacies shall be made so as to reduce the aggregate thereof to one-third of the estate. All property bequeathed or devised contrary to the provisions of this section shall go to the spouse, brother, sister, nephew, niece, descendant or ancestor of the testator, if and to the extent that they would have taken said property as aforesaid but for such devises or legacies; otherwise the testator's estate shall go in accordance with his will and such devises and legacies shall be unaffected.

"[Takers of property: Persons not relatives: Amount taken.] Nothing herein contained is intended to, or shall be deemed or construed to vest any property devised or bequeathed to charity or in trust for a charitable use, in any person who is not a relative of the testator belonging to one of the classes mentioned herein, or in any such relative, unless and then only to the exent that such relative takes the same under a substitutional or residuary bequest or devise in the will or under the laws of succession because of the absence of other effective disposition in the will."

This proposition is untenable. The Legislature in 1943 added to section 41 of the Probate Code this provision:

"Nothing herein contained is intended to, or shall be deemed or construed to vest any property devised or bequeathed to charity or in trust for a charitable use, in any person who is not a relative of the testator belonging to one of the classes mentioned herein, or in any such relative, *unless and then only to the extent that such relative takes the same under a substitutional or residuary bequest or devise in the will or under the laws of succession because of the absence of other effective disposition in the will."* (Italics added.)

It is the italicized language of the amendment that is particularly pertinent to the case at bar. By said language the Legislature has declared that where, as in this case, charitable gifts in a will are voidable, the portion of the estate represented thereby shall pass to a surviving relative only to the extent that such relative takes the same under a substitutional or residuary bequest or devise or, if there be no such substitutional or residuary bequest or devise, under the laws of succession if there be no other effective disposition thereof in the will.

Under the will of Walter Davis, his sister, nieces and nephews are not made beneficiaries under any substitutional or residuary bequest or devise and they cannot inherit under the laws of succession because there is no lack of effective disposition in the will of the portion of the estate represented by the charitable gifts in excess of one third of the estate.

In the case at bar, if the gifts to charity in excess of one third of the estate were voidable under section 41 of the Probate Code, the portion of the estate represented thereby would go to Messrs. Boyle and Matthews under the substitutional clause of paragraph Eleventh or pass under paragraph Tenth. There is thus no intestacy as to said portion of the estate. The substitutional gift to Messrs. Boyle and Matthews is clearly noncharitable, creates no trust and, as shown by *Estate of Purcell* (1914), 167 Cal. 176 [138 P. 704], [2]is unobjectionable under statutory restrictions upon gifts to charity.

[2]In *Estate of Purcell, supra,* the testatrix left the residue of her estate to Charles A. Purcell, a brother-in-law, declaring:

". . . It has always been my desire and purpose to devote a large part of my property and estate to charitable purposes and uses, and to make such provisions therefor in my will. But under the exigencies of this will I am not now able to designate the particular charities

Thus, the sister, nieces and nephews are excluded from participation either as legatees, devisees or heirs.

The conclusion must be that the only relatives of the prescribed classes surviving Walter Davis are precluded by law and by the terms of the will from participating in any distribution of that portion of the estate bequeathed or devised to charity. Therefore, the testamentary dispositions are valid and enforceable and the order of the probate court so construing the will is proper.

For the foregoing reasons the order is affirmed.

Moore, P. J., and Wilson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 27, 1946.

---

and benevolences to which I Mary B. Purcell desire to extend my bounty. The said Charles A. Purcell, however, is fully aware of and understands my desires in this regard, and I have full confidence in him that he will, in his judgment, respect and endeavor to carry out my said wishes and desires. I therefore request of him to do so, so far as he may think proper, without, however, intending by this clause or anything that may be herein stated, to create any trust or to place any limitations upon the said Charles A. Purcell, residuary legatee, in respect to the said legacy.''

The heirs attacked the residuary gift as violative of the statutory restrictions upon charitable gifts. The court said, on page 178:

''. . . The part of the will quoted above was properly declared valid. It does not create a precatory trust. But even if it did, the proportion of the estate not permitted by law to be so bequeathed and devised would, under the provisions of section 1313 of the Civil Code, [now substantially section 41 of the Probate Code] go to the residuary legatee if one were named in the will, and one is so designated. . . .''

This is a clear indication that under the law antedating the 1937 amendment of section 41 of the Probate Code, heirs might not inherit the portion of an estate represented by an excessive gift to charity if a residuary beneficiary were named. *Estate of Broad* (1942), 20 Cal. 2d 612 [128 P.2d 1], holding otherwise, was based upon section 41 as altered in 1937. The 1943 amendment restores the statute, in this respect, to its status precedent to the 1937 amendment.

[Crim. No. 3972. Second Dist., Div. Three. May 2, 1946.]

THE PEOPLE, Respondent, v. ALPHONSO TAYLOR, Appellant.

Crispus A. Wright for Appellant.

Robert W. Kenny, Attorney General, and L. G. Campbell, Deputy Attorney General, for Respondent.

WOOD, J.—Defendants Taylor and Bryant were charged in an information with the crime of grand theft of prop-

erty of the value of $650. They were also charged in another information with the crime of grand theft of other property of the value of $1,500. Trial by jury was waived, and the cases were consolidated and tried together. The court found defendants guilty as charged in each information, and Taylor appeals from the judgments.

Appellant contends that the ''decision'' is contrary to the law and the evidence. He asserts that possession of the stolen property by appellant is all that was shown, and that appellant met the burden of explaining that possession satisfactorily.

In the evening of April 9, 1945, one Seidman, a representative of a New York surgical instruments company, who was a guest at a hotel in Los Angeles, parked his automobile in the hotel parking lot, and locked the doors. At that time articles, which Seidman testified were of the value of $650, were in the automobile. Those articles included a brief case containing blueprints, a box of surgical instruments, a box of tools and a tobacco pouch with Seidman's name on it. When he returned the next morning the doors of his automobile were unlocked and the articles which were in it the night before were missing. In the evening of April 6, 1945, Merie Bosh, a resident of Salt Lake City, parked her automobile on a street in Los Angeles, and locked the doors. At that time her baggage and the baggage of her lady friend, which she testified were of the value of approximately $1,500, were in the automobile. The baggage included a great quantity of women's clothing, jewelry, and personal effects. The next day when she returned, the doors of her automobile were unlocked and her baggage and her lady friend's baggage were missing. On April 18, 1945, appellant was arrested as he and his girl friend alighted from an automobile across the street from 1637 South Essex Street, at which address they lived together in Room No. 7. Most of the articles which were missing from the Seidman and Bosh automobiles were found in that room.

A police officer testified that he was one of the two arresting officers; that immediately after appellant was placed under arrest, the officers took him and the girl to Room 7 at 1637 South Essex Street and told appellant to open the door to the room; that appellant said ''I don't know what you are talking about. This isn't my room''; that the witness then went to the landlady's apartment and had a conversation with her, after which he returned to Room 7 and

again told appellant to open the door; that either appellant or the girl then "produced" the key and unlocked the door; that the two officers, appellant and the girl entered the room; that there were tires, radios, flashlights, cameras, two guns— a .38 revolver and a .22 rifle, fishing poles, a box of doctor's instruments, an alligator-leather tobacco pouch with Seidman's name and address on it, blankets, clothes of different sizes, fur coats, several small "satchels or brief cases," trunks, suitcases, a soldier's uniform, jewelry and class pins in the room; that appellant told him he got the surgical instruments from his grandmother; that appellant said, in answer to questions as to where he acquired the other articles, that he had purchased them, or that he had won them while gambling, or that they were "just left there" by persons whose names and addresses he did not know.

Another police officer testified that he was assigned to investigate the case; that appellant told him that he did not have any women's clothes in his room; that the witness and three other police officers went to appellant's room and found a great quantity of women's clothing and other articles in the room, and it was impossible for the four officers to get into the room and some of them had to stand in the hall.

Appellant testified that two or three nights of each week he had dice games in his room; that certain articles (which were exhibits at the trial and identified by Seidman as articles missing from his automobile) including a box of surgical instruments, tools, and a leather "grip" and its contents came into his possession about a week before appellant was arrested when a man, whom appellant had never seen before and whose name he did not know, participated in a dice game in appellant's room and lost $65; that appellant lent the man $10 and took the box and grip as security; that he looked in the box before he made the loan and saw that it contained pliers, a screwdriver and some "shiny stuff" about six inches long, but he did not look in the grip at that time; that the man did not return to redeem the box and grip; that the man also had a tobacco pouch (the one with Seidman's name on it) which he offered to sell for fifty cents, and that he (appellant) gave him one dollar for it and the tobacco in it; that there were five or six men in his room when he acquired said property, but he did not know any of their names; that three or four of them were shipyard workers, and some of them lived in the

"apartment" where he lived; that he had seen "practically two" of them about two or three times before—they came to his room to gamble, but they never told appellant their names. He further testified that he and his girl friend had been living together about two years; that one day she asked him if she could buy some clothes from a boy whose wife had left him; that appellant told her to buy any of the clothes that would fit her; that she purchased wearing apparel and other articles (identified by Mrs. Bosh as those missing from her automobile) from this boy whose first name was Louie and whose last name he did not know but who was then living at the Pacific Hotel; that she paid for the articles with her own money; that they cost $45 or $50, and included blouses, a bracelet, a dress, and blankets; that his girl friend had "a great deal" of clothes before she made this purchase; that at the time of his arrest he didn't have anything in his room except his clothes and his girl friend's clothes. In answer to a further question, he stated that he also had at the time of his arrest one automobile tire, one fishing pole, one gun and one rifle in his room. He also testified that he did not tell the police officer he got the surgical instruments from his grandmother—that the officer asked him about an electric "smoothing iron" in his room, and he told him his grandmother gave that to him.

 Possession of stolen goods is not in itself sufficient to justify a conviction of grand theft. Possession of goods recently stolen may be considered by the court, however, in connection with other incriminating evidence and, if not satisfactorily explained, it is a circumstance tending to show guilt. (*People* v. *King,* 8 Cal.App. 329, 332 [96 P. 916]; *People* v. *Azbill,* 134 Cal.App. 616, 621 [25 P.2d 1010].) If an explanation of such possession is attempted by the accused it is for the trier of facts to judge of its truth and plausibility. (*People* v. *White,* 35 Cal.App.2d 61, 68 [94 P.2d 617]; *People* v. *McClain,* 115 Cal.App. 505, 508 [1 P.2d 1085].) It was stated in *People* v. *Taylor,* 4 Cal.App.2d 214, at page 217 [40 P.2d 870]: ". . . False statements showing consciousness of guilt or as to how the property came into defendant's possession, . . . inability to find the person from whom defendant claimed to have received the property, have each in turn been held to be sufficient to connect the accused with the crime when proven in connection with possession of the stolen property." As shown above, appellant falsely stated that he did not live in

room 7, that there was nothing in his room except clothes, and that there were no women's clothes in his room. He also said, according to the officer, that he obtained the surgical instruments from his grandmother. At another time he stated that he obtained the surgical instruments and certain other articles from a man he had never seen before and whose name he did not know; that said instruments and articles were obtained in the presence of five men whose names he did not know; and that his girl friend (who did not testify) purchased the large quantity of merchandise (identified as the property of Mrs. Bosh) from a boy named "Louie" whose last name he did not know.

The evidence in the present case was legally sufficient to justify the conclusion of the trial court.

The judgments are affirmed.

Desmond, P. J., and Shinn, J., concurred.

[Civ. No. 7218. Third Dist. May 2, 1946.]

EDGAR ARMSTRONG et al., Appellants, v. PACIFIC GREYHOUND LINES (a Corporation) et al., Respondents.

Lloyd Hewitt and Manwell & Manwell for Appellants.

Gerald M. Desmond and Philip C. Wilkins for Respondents.

THOMPSON, J.—Plaintiffs have appealed from a judgment rendered pursuant to the verdict of a jury in favor of Pacific Greyhound Lines and Rodney O. Nelson, the driver of the bus, in a suit for personal injuries received by paid passengers thereof as the result of a collision with a Ford automobile driven by the codefendant, Boyd. A verdict was also returned and a judgment rendered against Boyd for the sum of $15,000 and costs. The defendant Boyd has not appealed. The only issue on appeal is the alleged error of the trial court in instructing the jury in regard to the doctrine of res ipsa loquitur that it was necessary only for the Greyhound Lines and its driver of the bus to affirmatively prove facts *sufficient to offset the inference of negligence* created by the application of that principle. In other words, the jury was charged that it was not necessary for the appellants to refute the inference by a *preponderance* of the evidence.

The Pacific Greyhound Lines, a corporation, owned and operated the bus which was involved in the collision with an automobile on the highway between Roseville and Lincoln, at approximately 11:45 o'clock p. m. on November 23, 1943. Rodney O. Nelson, who had been employed as a driver of the Greyhound busses for three years, was operating the bus at the time of the accident. Loren P. Boyd was driving the Ford automobile which caused the accident. The plaintiffs were riding as paid passengers on the bus. The corporation and the drivers of both machines were sued as joint tort feasors. At the trial the plaintiffs furnished substantial evidence of the cause of the accident and of the negligence of the defendants, but also relied on the doctrine of res ipsa loquitur. There was a conflict of evidence regarding the assumed negligence of the Greyhound Lines and its driver Nelson. Boyd defaulted and he was not present at the trial. Nelson, the driver of the bus, and another disinterested witness, testified to facts tending strongly to refute the respondents' negligence.

There is ample evidence to support the verdict and judgment exonerating the Greyhound Lines and its driver, Nelson, from negligence. That fact is not disputed. James H. Scritchfield, who was a passenger on the bus, testified that the bus was traveling six miles beyond Roseville at about forty miles an hour on its proper side of a practically straight level highway when he saw the headlights of an approaching machine on its proper side of the highway; that when the Ford machine reached a point about 100 or 150 feet away it began to cross the white line onto the wrong side of the highway; that Nelson, the driver of the bus, applied his brakes and pulled his machine further over to his right hand side onto the shoulder of the roadway to avoid the collision; that "it happened so quick," and when the witness "saw this Ford was coming over on the bus' side, and I knowed it was going to hit, . . . I threw my hands up like this (indicating) then fell down into the floor." He said that the Ford crashed into the bus and struck about at the front wheel on the left hand side. Scritchfield's evidence was favorable to the respondents. He testified to no fact that would indicate that the driver of the bus was not thoroughly alert and exercising utmost diligence for the safety of his passengers.

Mr. Rodney Nelson, the driver of the bus, testified that he had been employed as a driver for the Pacific Greyhound Lines for three years; that the bus was in good mechanical condition; that he had on board twenty-one passengers, among whom were the plaintiffs; that he left Roseville for Lincoln at 11:15 o'clock p. m., on schedule time, and that he was driving along a straight stretch of highway with his left hand wheels about two feet from the center white line at approximately thirty-five or thirty-eight, not more than forty, miles per hour; that there was a shoulder on his side of the highway; that when he first saw the approaching machine it was about three-quarters of a mile away traveling on its proper side of the highway; that as it came nearer he saw its headlights "bobbing up and down," from which he concluded it was traveling rapidly; that when it was only about one hundred or one hundred and fifty feet away the Ford machine suddenly swerved across the white line directly toward the bus. He testified that after the Ford machine crossed the white line onto his side of the highway only two or three seconds elapsed before the crash occurred. He said "I didn't have more than time to swing the car and take my foot off the gas,

and put on the brake." He estimated that the Ford was traveling sixty or sixty-five miles per hour. The bus driver testified that he was traveling at a moderate rate of speed, far over on his proper side of the highway; that he used his dimmers to warn the driver of the approaching Ford car when he was half a mile away; that he kept watching him traveling along his proper side of the highway, and that when he suddenly swerved across the white line at a distance of only one hundred or one hundred and fifty feet, he had no time to do more than to pull his bus to the right, to take his foot off the gas and to apply the brake. The crash threw the bus to its right side and locked the steering gear. Nelson was thrown from his seat, but evidently clung to the wheel. The bus became uncontrollable. It ran a short distance and went off the shoulder and toppled over, seriously injuring both the plaintiffs and the bus driver. The driver was confined to a hospital for some time.

The foregoing evidence supports the verdict in favor of the respondents with the implied determination that the accident occurred and the plaintiffs were injured without fault or negligence on the part of the Pacific Greyhound Lines or the bus driver. The appellants do not challenge the sufficiency of the facts to support the verdict. The facts are related only to show the relevancy of the instruction to the jury upon the burden of proof and the weight of evidence, sufficient to refute the inference of negligence which may be deduced by application of the doctrine of res ipsa loquitur.

We are of the opinion the court did not err in charging the jury upon the subject of res ipsa loquitur, or otherwise. The jury was very fully and fairly instructed upon every essential issue of the case. The jury was charged that it was the duty of the Pacific Greyhound Lines, as a common carrier, to exercise utmost care for the safety of its passengers, to provide everything necessary for that purpose, and to use a reasonable degree of skill, to that end. (Civ. Code, § 2100.) The correctness of those and all other instructions is conceded by the appellants, with the exception of the following statement with respect to the doctrine of res ipsa loquitur:

"In making such a showing, it is not necessary for a defendant to overcome the inference by a preponderance of the evidence. Plaintiff's burden of proving negligence by a preponderance of the evidence is not changed by the rule just

mentioned. It follows, therefore, that in order to hold the defendant liable, the inference of negligence must have greater weight, more convincing force in the mind of the jury, than the opposing explanation offered by the defendant.

